E-FILED
Tuesday, 18 January, 2022  11:18:35 AM
Clerk, U.S. District Court, ILCD

EFILED
12/15/2021 4:56 PM
Melissa Quick
Clerk of the Circuit Court
Vermilion County, Illinois
AB, Deputy Clerk

IN THE CIRCUIT COURT OF VERMILLION COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| VISCOFAN USA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2021L 000066 |
| | ) | |
| JARVIS WELDING, L.L.P. d/b/a | ) | |
| JARVIS BOILER & WELDING, | ) | |
| SCHIMBERG CO., CRANE CO., | ) | |
| XOMOX CORPORATION, and | ) | |
| CRANE CHEMPHARMA & | ) | |
| ENERGY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | **JURY DEMANDED** |

## COMPLAINT AT LAW

NOW COMES Plaintiff, VISCOFAN USA, INC. ("Plaintiff" or "Viscofan"), by and

through its attorneys, LAW OFFICE OF GARRETT A. PHIPPS, and complaining of

Defendants, JARVIS WELDING, L.L.P. d/b/a JARVIS BOILER & WELDING ("Jarvis"),

SCHIMBERG CO. ("Schimberg"), CRANE CO. ("Crane Co."), XOMOX CORPORATION

("Xomox Corp."), and CRANE CHEMPHARMA & ENERGY ("Crane CP&E") (Crane Co.,

Xomox Corp, and Crane CP&E, collectively referred to herein as "Crane"), states as follows:

### PARTIES

1.      At all times relevant herein, Plaintiff, VISCOFAN USA, INC., was a Delaware

Corporation authorized to do business in the State of Illinois, with its U.S. corporate

headquarters located in Oak Brook, DuPage County, Illinois.

2.      At all times relevant herein, Defendant, JARVIS WELDING, L.L.P. d/b/a

JARVIS BOILER & WELDING, was an Illinois Limited Liability Partnership authorized to do

Exhibit 1

business in the State of Illinois, with its principal place of business located in Canton, Fulton County, Illinois.

3.     At all times relevant herein, Defendant, SCHIMBERG CO., was an Iowa Corporation authorized to do business in the State of Illinois, with an office located in Decatur, Macon County, Illinois with a designated agent in the State of Illinois, which did in fact conduct business in Illinois.

4.     At all times relevant herein, Defendant, CRANE CO., was a Delaware Corporation with its principal place of business located in Connecticut with a designated agent in the State of Illinois, which in fact conduct business in Illinois.

5.     At all times relevant herein, Defendant XOMOX CORPORATION, was an Ohio Corporation with its principal place of business located in Ohio with a designated agent in the State of Illinois, which did in fact conduct business in Illinois.

6.     At all times relevant herein, CRANE CHEMPHARMA & ENERGY was a foreign corporation or other business entity that does not maintain a place of business or a designated place of business in the State of Illinois, but which did in fact conduct business in Illinois.

## JURISDICTION & VENUE

7.     Jurisdiction is appropriate as to Jarvis under 735 ILCS 5/2-209 as it is an Illinois Limited Liability Partnership with its principal place of business located in Canton, Fulton County, Illinois.

8.     Jurisdiction is appropriate as to Schimberg under 735 ILCS 5/2-209 as it is authorized to do business in the State of Illinois, has an office located in Decatur, Macon County, Illinois, and regularly conducts business in the State of Illinois.

- 2 -

9.     Jurisdiction is appropriate as to Crane under 735 ILCS 5/2-209 as: (i) the claims asserted herein against Crane arise directly from Crane's purposeful contacts with the State of Illinois; (ii) Plaintiff's damages arise directly out of Crane's purposeful contacts with Illinois as Plaintiff's damages occurred during its use of a product designed, manufactured, and marketed by Crane, which was ultimately sold to Plaintiff through a distributor with an office located in Illinois; (iii) Crane intentionally placed the subject product into the stream of commerce with the expectation and intention that it would specifically reach Illinois and, furthermore, engaged and/or utilized a distributor with an office located in Decatur, Illinois, who markets to and serves companies located in Illinois; (iv) Crane benefited from Illinois' systems of laws, infrastructure, and business climate;  (v) it is foreseeable to Crane that a party could be injured and/or damaged by one of its products sold to an Illinois company and that such a person or entity would seek recourse in an Illinois court; and (vi) the State of Illinois has an indisputable interest in resolving litigation with respect to a product sold in the State of Illinois that implicates concerns of products liability and occupational safety.

10.     Venue is appropriate under 735 ILCS 5/2-101 as the transaction, or some part thereof, giving rise to this Complaint, occurred in Danville, Vermillion County, Illinois.

## FACTS COMMON TO ALL COUNTS

11.     Viscofan is a manufacturer of casings for meat products with a 389,120 square foot facility located in Danville, Illinois, where it employs 310 employees.

12.     In July of 2019, Viscofan decided to replace an existing valve on Boiler No. 1 located in the powerhouse for its Danville, Illinois production facility.

13.     Viscofan received a quote from Jarvis to "provide labor, equipment and material to remove old valve and install new 250 psi 8" stop check on top of boiler."

- 3 -

14.     On July 30, 2019, Viscofan issued Purchase Order #4500474401 to Jarvis for the purchase and installation of a non-return valve in the amount of $15,745.00.

15.     The non-return valve selected by Jarvis was a Crane Co. 30E Angle Stop Check Valve with identifying information J5318 06092, T594, A536-DI, and 04-18 listed on the device (the subject non-return valve hereinafter referred to as the "NRV").

16.     On August 31, 2019, Jarvis delivered and installed the NRV at Viscofan's Danville facility.

17.     In the early morning hours of March 21, 2021, the NRV suddenly ruptured, causing large amounts of steam to evacuate into the building and sending numerous pieces of metal hurtling through the air, causing extensive property damage to the ceiling, roof, and equipment at this facility.

18.     The steam released by the aforementioned rupture also caused injuries to one Viscofan employee.

19.     Due to the extent and nature of the damage caused by the aforementioned rupture, Viscofan was forced to temporarily cease production at this facility for eleven days during which time repairs were made to the extensive damage.

20.     As a result of the aforementioned eleven-day shutdown, Viscofan also suffered economic losses.

21.     Jarvis purchased the NRV from Defendant, Schimberg.

22.     The NRV was designed, manufactured, and marketed by Crane.

## COUNT I
### (BREACH OF EXPRESS WARRANTY—825 ILCS 5/2-313—JARVIS)

23.     Plaintiff adopts and incorporates by reference Paragraphs 1 through 22 of the Complaint as fully set forth herein.

- 4 -

24.   The NRV is considered a "good" as that term is defined under the Uniform Commercial Code.

25.   The NRV was sold by Jarvis to Viscofan pursuant to Purchase Order #4500474401. A copy of said Purchase Order is attached hereto as **Exhibit A** and made part hereof.

26.   Viscofan fully performed its obligations under the Purchase Order, including making all payments thereunder.

27.   As part of the consideration for Viscofan's purchase of goods, a warranty was provided for in the Purchase Order as follows:

> Seller [Jarvis] declares that he is aware of the Customers' activities and final use
> of the Product and warrants merchantability and suitability of the Products for any
> particular use or purpose within the current activities of the Customer whether on
> its own or in combination with other substances.

**Exhibit A**, Standard Terms and Conditions for Purchase, Section 11.

28.   Viscofan reasonably relied on this warranty in entering into the Purchase Order.

29.   At the time of the sale and delivery of the NRV, Jarvis breached the terms of the express warranty because the NRV was not as warranted to Viscofan for the following reasons:

a.   was of a substandard quality;

b.   did not meet material specifications;

c.   did not meet proper material chemistries;

d.   did not meet performance criteria;

e.   was not fit for its purpose; and

f.   was otherwise defective.

- 5 -

30.     Viscofan immediately notified Jarvis of the NRV failure that occurred on March 21, 2021 on the same day of said occurrence.

31.     Viscofan also issued a written demand to Jarvis to perform under the terms of this express warranty.

32.     Jarvis has refused Viscofan's request to perform its obligations under the terms of the express warranty.

33.     As a direct and proximate result of Jarvis' breach of the express warranty, Viscofan suffered damage.

WHEREFORE, Plaintiff, Viscofan, respectfully prays for the entry of a verdict by a jury against Defendant, Jarvis, in an amount in excess of the jurisdictional limits of the Law Division of the Circuit Court of Vermillion County, Illinois.

**COUNT II**
**BREACH OF IMPLIED WARRANTY**
**OF MERCHANTABILITY—810 ILCS 5/2-314—JARVIS**

34.     Plaintiff adopts and incorporates by reference Paragraphs 1 through 22 of its Complaint as fully set forth herein.

35.     The NRV is considered a "good" as that term is defined under the Uniform Commercial Code.

36.     The NRV was sold by Jarvis to Viscofan pursuant to Purchase Order #4500474401. **Exhibit A.**

37.     Viscofan fully performed its obligations under the Purchase Order, including making all payments thereunder.

38.     Pursuant to 810 ILCS 5/2-314, a warranty that the NRV is merchantable is implied in the contract between Jarvis and Viscofan for the sale of the NRV. Jarvis did not exclude or modify the implied warrant of merchantability.

39.     Jarvis, in the course of its business, deals in transactions involving goods such as the NRV and holds itself out as having knowledge and skill with respect thereto.

40.     Jarvis knew that Viscofan intended to use the NRV in its Boiler No. 1 at its production facility, recommended and selected the NRV for that purpose and knew that Viscofan was relying on its knowledge, skills and experience in selecting the NRV.

41.     Viscofan reasonably relied upon Jarvis' knowledge, skills, and experience with respect to the purchase of the NRV.

42.     At the time of this sale, the NRV was not merchantable for the following reasons:

    a.  did not meet material specifications;

    b.  did not meet proper material chemistries;

    c.  did not meet performance criteria;

    d.  failed to operate for its purpose; and

    e.  was otherwise defective.

43.     Viscofan's use of the NRV was not abnormal and the NRV failed to perform the functions for which it was purchased.

44.     Viscofan immediately notified Jarvis of the NRV failure that occurred on March 21, 2021 on the same day of said occurrence.

45.     Viscofan also issued a written demand to Jarvis to discharge its warranty obligations.

46.     Jarvis has refused Viscofan's request to perform its obligations under the implied warranty of merchantability.

47.     As a direct and proximate result of Jarvis' breach of the implied warranty of merchantability, Viscofan suffered damages.

48.     Viscofan suffered damages WHEREFORE, Plaintiff, Viscofan, prays for the entry of a verdict by a jury against Defendant, Jarvis in an amount in excess of the jurisdictional limits of the Law Division of the Circuit Court of Vermillion County, Illinois.

### COUNT III
### (BREACH OF IMPLIED WARRANTY OF
### FITNESS FOR A PARTICULAR PURPOSE—810 ILCS 5/2-315—JARVIS)

49.     Plaintiff adopts and incorporates by reference Paragraphs 1 through 22 of its Complaint as fully set forth herein.

50.     The NRV is considered a "good" as that term is defined under the Uniform Commercial Code.

51.     The NRV was sold by Jarvis to Viscofan pursuant to Purchase Order #4500474401. **Exhibit A.**

52.     Viscofan fully performed its obligations under the Purchase Order, including making all payments thereunder.

53.     Pursuant to 810 ILCS 5/2-315, a warranty that the NRV is fit for a particular purpose is implied in the contract between Jarvis and Viscofan for the sale of the NRV. Jarvis did not exclude or modify the implied warrant of fitness for a particular purpose.

54.     Jarvis knew the particular purpose for which Viscofan intended to use the NRV in its Boiler No. 1 at its production facility, recommended and selected the NRV for that particular

purpose and knew that Viscofan was relying on its knowledge, skills and experience in selecting the NRV.

55.     Viscofan reasonably relied upon Jarvis' knowledge, skill, experience, and judgment with respect to the selection and purchase of the NRV.

56.     At the time of this sale, the NRV was not fit for this particular purpose for the following reasons:

        a.   did not meet material specifications;

        b.   did not meet proper material chemistries;

        a.   did not meet performance criteria;

        c.   failed to operate for its particular purpose; and

        d.   was otherwise defective.

57.     Viscofan immediately notified Jarvis of the NRV failure that occurred on March 21, 2021 on the same day of said occurrence.

58.     Viscofan also issued a written demand to Jarvis to discharge its warranty obligations.

59.     Jarvis has refused Viscofan's request to perform its obligations under the implied warranty of fitness for a particular purpose.

60.     As a direct and proximate result of. Jarvis' breach of the implied warranty of fitness for a particular purpose, Viscofan suffered damages.

WHEREFORE, Plaintiff, Viscofan, prays for the entry of a verdict by a jury against Defendant, Jarvis, in an amount in excess of the jurisdictional limits of the Law Division of the Circuit Court of Vermillion County, Illinois.

## COUNT IV
### (BREACH OF CONTRACT—JARVIS)

61.     Plaintiff adopts and incorporates by reference Paragraphs 1 through 22 of its Complaint as fully set forth herein.

62.     Viscofan Purchase Order #4500474401 is a valid and enforceable contract. **Exhibit A**.

63.     Viscofan fully performed its obligations under the Purchase Order, including making all payments thereunder.

64.     The Purchase Order states that:

The Seller [Jarvis] warrants that Product delivered to Customer shall meet the Customer's standard specifications for such Product or any special specifications that are specifically agreed upon between the Seller and the Customer. The Seller declares that he is aware of the Customers' activities and final use of the Product and warrants merchantability and suitability of the Products for any particular use or purpose within the current activities of the Customer whether on its own or in combination with other substances. If the Customer establishes to the Supplier's reasonable satisfaction that the Product is not in accordance with the Contract or is defective, the Customer will have the option either to replacement of the Product or refund of the purchase price upon return of the Product without prejudice of any other remedies. The Supplier shall bear all charges for rejection of the Product. The Supplier's liability shall include all damages of any kind including without limitation, direct, indirect, incidental, punitive, special and consequential damages (including without limitation loss of profits or loss of revenues) arising out of or in

connection with the Product supplied whether by the negligence of the Supplier, a fraudulent misrepresentation made by the Supplier or any other reason.

**Exhibit A**, Standard Terms and Conditions for Purchase, Section 11.

65.    Viscofan reasonably relied upon Jarvis' above referenced statements in the Purchase Order.

66.    The selection, provision, and installation of the NRV failed to meet standard specifications, special specifications, was not in accordance with the contract, was defective, and otherwise constituted a breach of contract in the following manner:

      a.  did not meet standard specifications regarding maximum operating pressure;

      b.  did not meet standard specifications regarding material strength;

      c.  did not meet required material chemistries;

      d.  failed to operate in a safe and continuous manner;

      e.  failed to support and permit the safe and continuous operation of the boiler on which it was installed;

      f.  was improperly selected; and

      g.  was improperly installed;

67.    As a direct and proximate result of Jarvis' breach of contract, Viscofan suffered damages.

WHEREFORE, Plaintiff, Viscofan, prays for the entry of a verdict by a jury against Defendant, Jarvis, in an amount in excess of the jurisdictional limits of the Law Division of the Circuit Court of Vermillion County, Illinois.

## COUNT V
### (BREACH OF CONTRACT—FAILURE TO PROCURE INSURANCE—JARVIS)

68.     Plaintiff adopts and incorporates by reference Paragraphs 1 through 22 of the Complaint as fully set forth herein.

69.     Viscofan and Jarvis are parties to the Blanket Agreement to Hold Harmless and to Procure Insurance, dated June 14, 2016 (the "Blanket Agreement"). A copy of said Blanket Agreement is attached hereto as **Exhibit B** and made part hereof.

70.     The Blanket Agreement applies to all orders or agreements entered into between Viscofan and Jarvis following its execution date of June 14, 2016. **Exhibit B**, p. 3.

71.     The Blanket Agreement was in effect at the time the Purchase Order was entered into between and when the NRV failure occurred.

72.     Viscofan relied upon the existence, effectiveness, and enforceability of the insurance provisions provided for in the Blanket Agreement as a condition precedent to entering into the Purchase Order for the NRV with Jarvis.

73.     Pursuant to the Blanket Agreement, Jarvis is required to obtain specific insurance coverages with Viscofan to be listed as an additional insured or named insured under such policies. **Exhibit B**, Section 1 & Section 2.C.

74.     Viscofan requested that Jarvis confirm that it was an additional insured or named insured as required under the Blanket Agreement.

75.     Viscofan was informed by Jarvis' insurer, Cincinnati Insurance, that Viscofan was *not* in fact a named insured or an additional insured under any policy issued to Jarvis with respect to the NRV failure.

76.     Jarvis' failure to procure insurance with Viscofan listed as named insured or additional insured constitutes a breach of the Blanket Agreement.

- 12 -

77.     The losses suffered by Viscofan as a result of the NRV failure would have been covered under the required insurance coverages contained in the Blanket Agreement, including the Commercial Comprehensive General Liability Coverage. **Exhibit B,** Section 2(B).

78.     As a direct and proximate result of Jarvis' failure to procure insurance, Viscofan has suffered damages, including but not limited to the complete loss of insurance coverage for this loss and the inability to assert, control, and dispute claims directly with the insurer.

WHEREFORE, Plaintiff, Viscofan, prays for the entry of a verdict by a jury against Defendant, Jarvis, in an amount in excess of the jurisdictional limits of the Law Division of the Circuit Court of Vermillion County, Illinois

**COUNT VI**
**(BREACH OF CONTRACT**
**FAILURE TO PROVIDE INDEMNIFICATION—JARVIS)**

79.     Plaintiff adopts and incorporates by reference Paragraphs 1 through 22 of its Complaint as fully set forth herein.

80.     Viscofan and Jarvis are parties to the Blanket Agreement to Hold Harmless and to Procure Insurance, dated June 14, 2016 (the "Blanket Agreement"). A copy of said Blanket Agreement is attached hereto as **Exhibit B** and made part hereof.

81.     The Blanket Agreement applies to all orders or agreements entered into between Viscofan and Jarvis following its execution date of June 14, 2016. **Exhibit B,** p. 3.

82.     The Blanket Agreement was in effect at the time the Purchase Order was entered into and when the NRV failure occurred.

83.     Pursuant to the Blanket Agreement, Jarvis has an obligation to:

…indemnify, protect and save harmless the Company [Viscofan.], its property, its agents and employees from and against all loss and expenses (including cost and

- 13 -

reasonable attorney's fees) that may be claimed or asserted against, or be imposed by law upon, the Company on account of, resulting from, arising out of, or in consequence of the performance of our work, including without limitation, to indemnify, protect and save harmless the Company from and against all loss, expenses (including reasonable attorneys' fees), claims, suits, actions, demands, liens, damages, fines, penalties, judgements or decrees, or claims or damages of whatever kind or nature.

**Exhibit B**, paragraph 1.

84.　　The Blanket Agreement does not limit its application to third party claims and is therefore applicable to the direct losses suffered by Viscofan.

85.　　The damages incurred by Viscofan occurred "on account of, resulting from, arising out of, or in consequence of" the work performed by Jarvis pursuant the aforementioned Purchase Order. **Exhibit B**, Section 1.

86.　　Viscofan relied upon the existence, effectiveness, and enforceability of the indemnification provided for in the Blanket Agreement as a condition precedent to entering into the Purchase Order for the NRV with Jarvis.

87.　　Following the NRV failure, Viscofan submitted its demand for indemnification to Jarvis, requesting indemnification with respect to the losses and costs resulting from, arising out of or as a consequence of Jarvis' work.

88.　　Jarvis has rejected Viscofan's demand for indemnification.

89.　　As a direct and proximate result of Jarvis' failure to provide indemnification, Viscofan has suffered damages.

WHEREFORE, Plaintiff, Viscofan, prays for the entry of a verdict by a jury against Defendant, Jarvis, in an amount in excess of the jurisdictional limits of the Law Division of the Circuit Court of Vermillion County, Illinois, and applicable attorney's fee, costs, and any other remedies the Court deems appropriate.

## COUNT VII
### (DECLARATORY RELIEF—JARVIS)

90.     Plaintiff adopts and incorporates by references Paragraphs 79 through 84 of Count VI of its Complaint as fully set forth herein.

91.     An actual controversy exists regarding Viscofan's rights and Jarvis' obligations under the Blanket Agreement.

92.     Moreover, this matter is appropriate for declaratory judgement because, as an indemnification claim for a direct loss, there is no underlying liability determination necessary to be made prior to its adjudication.

93.     This matter is further appropriate for declaratory judgement because all of the liabilities, costs, and expenses arising out of the event have been fully realized and incurred by Plaintiff.

WHEREFORE, Plaintiff, Viscofan, requests that this Court:

    a.    Order that Jarvis must "indemnify, protect and save harmless" Viscofan "from and against all loss and expenses (including costs and reasonable attorneys' fees) that may claimed or asserted against, or imposed by law upon, [Viscofan] on account of, resulting from, arising out of, or in consequence of" the purchase and installation of the NRV as provided in the Blanket Agreement. **Exhibit B**, Section 1.

- 15 -

b.  Grant Viscofan such additional and further relief as this Court deems just and proper.

## COUNT VIII
### (STRICT LIABILITY—JARVIS)

94.    Plaintiff adopts and incorporates by reference Paragraphs 1 through 22 of the of its Complaint as if fully set forth herein.

95.    On or about August 31, 2019, Jarvis sold and otherwise placed into the stream of commerce a certain non-return valve that it also installed at the aforesaid premises.

96.    Following the March 21, 2021 explosion, the NRV was subjected to metallurgical testing and analyses that revealed deficiencies with respect to material chemistries, material specifications, and satisfaction of performance criteria, in addition to other problems.

97.    At all times relevant herein, Jarvis had a duty to sell a non-return valve that was not unreasonably dangerous and defective when used in a reasonably foreseeable manner.

98.    At all times the NRV left the control of Jarvis, and was placed into the stream of commerce, it was in a condition which rendered it unreasonably dangerous, defective, and unsafe in one or more of the following respects:

a.  did not meet material specifications;

b.  did not meet proper material chemistries;

c.  did not meet performance criteria;

d.  was not designed and/or manufactured with proper or adequate quality controls and/or quality assurance processes;

e.  did not perform in the manner reasonably to be expected in light of its intended use; and

f.  was otherwise unreasonably dangerous, defective and unsafe.

- 16 -

99.    As a direct and proximate result of one or more of these unreasonably dangerous, defective, and unsafe conditions, Viscofan suffered damages.

WHEREFORE, Plaintiff, Viscofan, prays for the entry of a verdict by a jury against Defendant, Jarvis, in an amount in excess of the jurisdictional limits of the Law Division of the Circuit Court of Vermillion County, Illinois

**COUNT IX**
**(NEGLIGENCE—JARVIS)**

100.    Plaintiff adopts and incorporates by reference Paragraphs 1 through 22 of the of its Complaint as if fully set forth herein.

101.    On or about August 31, 2021, Jarvis sold and otherwise placed into the stream of commerce a certain non-return valve that it also installed at the aforesaid premises

102.    At all times relevant herein, Jarvis had a duty to exercise reasonable care in the selection, sale, distribution, and installation of the aforementioned NRV.

103.    Jarvis breached the aforementioned duty by committing one or more of the following careless and negligent acts and/or omissions:

        a.  failed to sell, distribute, select or install a non-return valve designed and/or manufactured in accordance with material specifications;

        b.  failed to sell, distribute, select or install a non-return valve designed and/or manufactured with proper material chemistries;

        c.  failed to sell, distribute, select or install a non-return valve able to satisfy performance criteria;

        d.  failed to sell, distribute, select or install a non-return valve designed and/or manufactured with proper or adequate quality controls and/or quality assurance processes;

- 17 -

    e.   failed to sell, distribute, select or install a non-return valve able to perform in

         the manner reasonably to be expected in light of its intended use;

    f.   improperly selected the NRV;

    g.   improperly installed the NRV at the aforementioned premises;

    h.   failed to test the NRV for any and all defects;

    i.   failed to inspect the NRV for any and all defects; and

    j.   was otherwise careless or negligent.

    104.   As a direct and proximate result of one or more of these aforesaid careless and

negligent acts and/or omissions, Viscofan suffered damages.

    WHEREFORE, Plaintiff, Viscofan, prays for the entry of a verdict by a jury against

Defendant, Jarvis, in an amount in excess of the jurisdictional limits of the Law Division of the

Circuit Court of Vermillion County, Illinois.

### COUNT X
### (STRICT LIABILITY—SCHIMBERG)

    105.   Plaintiff adopts and incorporates by reference Paragraphs 1 through 22 of the of

its Complaint as if fully set forth herein.

    106.   At some point prior to March 21, 2021, Schimberg, sold, distributed and

otherwise placed into the stream of commerce a certain non-return valve that was installed at the

aforesaid premises.

    107.   Following the March 21, 2021 explosion, the NRV was subjected to metallurgical

testing and analyses that revealed deficiencies with respect to material chemistries, material

specifications, and satisfaction of performance criteria, in addition to other problems.

108.    At all times relevant herein, Schimberg had a duty to distribute and sell a non-return valve that was not unreasonably dangerous and defective when used in a reasonably foreseeable manner.

109.    At all times the NRV left the control of Schimberg and was placed into the stream of commerce, it was in a condition which rendered it unreasonably dangerous, defective, and unsafe in one or more of the following respects:

        a.  did not meet material specifications;

        b.  did not meet proper material chemistries;

        c.  did not meet performance criteria;

        d.  was not designed and/or manufactured with proper or adequate quality controls and/or quality assurance processes;

        e.  did not perform in the manner reasonably to be expected in light of its intended use; and

        f.  was otherwise unreasonably dangerous, defective and unsafe.

110.    As a direct and proximate result of one or more of these unreasonably dangerous, defective, and unsafe conditions, Viscofan suffered damages.

WHEREFORE, Plaintiff, Viscofan, prays for the entry of a verdict by a jury against Defendant, Schimberg, in an amount in excess of the jurisdictional limits of the Law Division of the Circuit Court of Vermillion County, Illinois

**COUNT XI**
**(NEGLIGENCE—SCHIMBERG)**

111.    Plaintiff adopts and incorporates by reference Paragraphs 1 through 22 of the of its Complaint as if fully set forth herein.

112. At some point prior to March 21, 2021, Schimberg sold, distributed and otherwise placed into the stream of commerce the NRV that was installed at the aforesaid premises.

113. Following the March 21, 2021 explosion, the NRV was subjected to metallurgical testing and analyses that revealed deficiencies with respect to material chemistries, material specifications, and satisfaction of performance criteria, in addition to other problems.

114. At all times relevant herein, Schimberg had a duty to exercise reasonable care in the distribution and sale of the aforementioned non-return valve.

115. Schimberg breached the aforementioned duty by committing one or more of the following careless and negligent acts and/or omissions:

   a. failed to sell or distribute a non-return valve in accordance with material specifications;

   b. failed to sell or distribute a non-return valve designed and/or manufactured with proper material chemistries;

   c. failed to sell or distribute a non-return valve designed and/or manufactured able to satisfy performance criteria;

   d. failed to sell or distribute a non-return valve designed and/or manufactured with proper or adequate quality controls and/or quality assurance processes;

   e. failed to sell or distribute a non-return valve able to perform in the manner reasonably to be expected in light of its intended use; and

   f. was otherwise careless or negligent.

116. As a direct and proximate result of one or more of these aforesaid careless and negligent acts and/or omissions, Viscofan suffered damages.

WHEREFORE, Plaintiff, Viscofan, prays for the entry of a verdict by a jury against Defendant, Schimberg, in an amount in excess of the jurisdictional limits of the Law Division of the Circuit Court of Vermillion County, Illinois.

## COUNT XII
## (STRICT LIABILITY—CRANE)

117.    Plaintiff adopts and incorporates by reference Paragraphs 1 through 22 of the of its Complaint as if fully set forth herein

118.    At some point prior to March 21, 2021, Crane designed, manufactured, marketed, sold and otherwise placed into the stream of commerce a certain non-return valve that was installed at the aforesaid premises.

119.    Upon information and belief, the NRV was manufactured in April of 2018.

120.    Following the March 21, 2021 explosion, the NRV was subjected to metallurgical testing and analyses that revealed deficiencies with respect to material chemistries, material specifications, and satisfaction of performance criteria, in addition to other problems.

121.    At all times relevant herein, Crane had a duty to design, manufacture, market, and sell a non-return valve that was not unreasonably dangerous and defective when used in a reasonably foreseeable manner.

122.    At all times the NRV left the control of Crane and was placed into the stream of commerce, it was in a condition which rendered it unreasonably dangerous, defective, and unsafe in one or more of the following respects:

        a.   did not meet material specifications;

        b.   did not meet proper material chemistries;

        c.   did not meet performance criteria;

    d.   was not subject to adequate quality controls and/or quality assurance processes;

    e.   did not perform in the manner reasonably to be expected in light of its intended use; and

    f.   was otherwise unreasonably dangerous, defective and unsafe.

123.    As a direct and proximate result of one or more of these unreasonably dangerous, defective, and unsafe conditions, Viscofan suffered damages.

WHEREFORE, Plaintiff, Viscofan, prays for the entry of a verdict by a jury against Defendant, Crane, in an amount in excess of the jurisdictional limits of the Law Division of the Circuit Court of Vermillion County, Illinois

## COUNT XIII
### (NEGLIGENCE—CRANE)

124.    Plaintiff adopts and incorporates by reference Paragraphs 1 through 22 of the of its Complaint as if fully set forth herein

125.    At some point prior to March 21, 2021, Crane designed, manufactured, marketed, sold and otherwise placed into the stream of commerce a certain non-return valve that was installed at the aforesaid premises.

126.    Upon information and belief, the NRV was manufactured in April of 2018.

127.    Following the March 21, 2021 explosion, the NRV was subjected to metallurgical testing and analyses that revealed deficiencies with respect to material chemistries, material specifications, and satisfaction of performance criteria, in addition to other problems.

128.    At all times relevant herein, Crane had a duty to exercise reasonable care in the design, manufacture, marketing, and sale of the aforementioned non-return valve.

129. Crane breached the aforementioned duty by committing one or more of the following careless and negligent acts and/or omissions:

    a. failed to design, manufacture, market, sell or distribute a non-return valve in accordance with material specifications;

    b. failed to design, manufacture, market, sell or distribute a non-return valve with proper material chemistries;

    c. failed to design, manufacture, market, sell or distribute a non-return valve able to satisfy performance criteria;

    d. failed to design, manufacture, market, sell or distribute a non-return valve with proper or adequate quality controls and/or quality assurance processes;

    e. failed to design, manufacture, market, sell or distribute a non-return valve able to perform in the manner reasonably to be expected in light of its intended use; and

    f. was otherwise careless or negligent.

130. As a direct and proximate result of one or more of these aforesaid careless and negligent acts and/or omissions, Viscofan suffered damages.

WHEREFORE, Plaintiff, Viscofan, prays for the entry of a verdict by a jury against Defendant, Crane, in an amount in excess of the jurisdictional limits of the Law Division of the Circuit Court of Vermillion County, Illinois.

LAW OFFICE OF GARRETT A. PHIPPS

By   /s/ Garrett A. Phipps
       Garrett A. Phipps

- 23 -

LAW OFFICE OF GARRETT A. PHIPPS
Attorney for Plaintiff
2225 W. Waveland Ave.
Chicago, IL 60618
garrett@gaphippslaw.com
(312) 972-1869
Atty No. 6282056

IN THE CIRCUIT COURT OF VERMILLION COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| VISCOFAN USA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. |
| | ) | |
| JARVIS WELDING, L.L.P., | ) | |
| d/b/a JARVIS BOILER & WELDING, | ) | |
| SCHIMBERG CO, CRANE CO., | ) | |
| XOMOX CORPORATION, and | ) | |
| CRANE CHEMPHARMA & ENERGY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## ILLINOIS SUPREME COURT RULE 222 AFFIDAVIT

The undersigned attorney, Garrett A. Phipps, hereby certifies pursuant to Illinois Supreme Court Rule 222(b) that the total of money damages sought in the above-captioned matter, VISCOFAN USA, INC. v. JARVIS WELDING LLP *does* exceed $50,000.00.

## VERIFICATION BY CERTIFICATION

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this affidavit are true and correct except to the matters therein stated to be on information and belief as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

| | |
|---|---|
| /s/ Garrett A. Phipps | December 15, 2021 |
| Garrett A. Phipps | Date |

**<u>EXHIBIT A</u>**



Viscofan USA, Inc.
915 N Michigan Avenue
Danville, Il 61832
Tel 217-446-6467
fax 217-444-8361
www.viscofan.com

# Purchase Order

**PO Number: 4500474401**
**Date:** 07/30/2019
**Delivery Date:** See items
**Currency:** USD
**Payment Conditions:** Net 30 days
**Incoterms:** FOB Free on Board
**Created by:** Kerri Rollins

**Ship to :**
Viscofan USA, Inc.
915 North Michigan Avenue
Danville IL  61832

**Contact Person:** Kerri Rollins
**Fax:** 217-444-8240 – **Telephone:** +12174448263
**E-Mail:** RollinsK@usa.viscofan.com

---

**Vendor Name: JARVIS WELDING LLP**
**Vendor Code:** 52401905        **Tax Number:** 37-0601672
**Address:** 124 EAST PINE STREET
          CANTON 61520 USA
**Tel/Fax:** 309-647-0033  –  309-647-3808
**E-Mail:** JARVISBOILER@SBCGLOBAL.NET
**Please confirm Price and delivery to** RollinsK@usa.viscofan.com

**Invoicing address:**
Viscofan USA, Inc
50 County Court
Montgomery, AL 36105
us.payable@usa.viscofan.com

---

| ITEM / MAT. CODE / MATERIAL DESCRIPTION | QUANTITY | UM | UNIT PRICE | TOTAL AMOUNT |
|---|---|---|---|---|
| Steve Benson | | | | |
| PR 19082264 | | | | |
| No quote number provided | | | | |
| 0010 **#1 Boiler Stop Check NRV** | 1 EA | | | |
| Gross Price       15,745.00   USD /   1EA | | | | 15,745.00 |
| *** Item completely delivered *** | | | | |

**AUTHORIZED SIGNATURE:**        **Total EXCL. TAX 15,745.00   USD**

- Attached below document "Terms and Conditions".
- Taxes not included. Cash Discount not included.
- Goods should arrive in perfect condition.
- For every delivery we need your invoice in duplicate.
- Indicate on the invoice, delivery note and corresponding our ORDER number.
- Invoices must proceed in headquarters within the first five days of the following month.
- Please return the order with acceptance. If it is not returned within 72 hours it will be understood that agree with the above conditions.
- Comply with the deadline indicated above or subsequently agreed delivery, otherwise be responsible of damage.
- All preparations considered dangerous goods shall comply with the law.



PO Number:  4500474401

Viscofan USA, Inc.
915 N Michigan Avenue
Danville, IL 61852
Tel.217-446-6460
Fax.217-444-8961
www.viscofan.com

## STANDARD TERMS AND CONDITIONS FOR PURCHASE

The following Terms and Conditions will govern any Contract for the purchase of the Product that we enter into with you. Please read these Terms and Conditions carefully. By entering into a Contract with the Customer, you are acknowledging that you have read and understood these Terms and Conditions, in particular those relating to rights, liabilities and the manner in which we may make changes to these Terms and Conditions.

1. INTERPRETATION.- In these Terms and Conditions, unless the context otherwise requires, the following expressions have the following meanings: "the Contract" means the contract between the Supplier and the Customer for the supply of the Product subject to these Terms and Conditions; "Commencement of the Contract" means the date upon which the earliest of the events recited in clause 2 of the Terms and Conditions occurs; "the Supplier" means the person or entity who accepts an order from "the Customer" for the Product; "Parties" means the parties to the Contract, being the Supplier and the Customer; "the Product" means any merchandise or service that the Customer may include in an order sent to the Supplier, for use in the production of goods according to its regular activity or any related activity or for any other use that the Customer may have explained to the Supplier, forming the subject matter of the Contract (including any instalment or part of such Product); "the Customer" means Viscofan USA; "Terms and Conditions" means these terms and conditions of purchase. Words in the singular include the plural and in the plural include the singular. Headings in these Terms and Conditions do not affect the interpretation of these Terms and Conditions. Any reference to a particular law is a reference to it as it is in force for the time being taking account of any amendment, extension, application or re-enactment and includes any reference to subordinate legislation for the time being in force made under it. These Terms and Conditions may be modified by the Customer at any time and acceptance of an order by the Supplier involves its acceptance of the new wording.

2. SUPPLY OF THE PRODUCTS.- The Supplier shall supply and the Customer shall purchase the Product as principals only, to the intent and with the effect that no other party shall have the rights or obligations or be entitled to sue, or are liable to be sued, under the Contract. The Supplier shall sell and the Customer shall purchase the Product subject to these Terms and Conditions to the exclusion of all other terms and conditions (including any terms and conditions which the Supplier purports to apply). No Contract shall come into existence until the Customer's order (however given) is expressly accepted by the Supplier in all its terms by the earliest of:- a)written confirmation from the Supplier or b) receipt by the Customer of the Product.

The Customer shall not be under any obligation to accept any supply of all or any of the Product prior to acceptance by Supplier of each order.

3. PRICE.- Where applicable all prices quoted and invoiced are inclusive of the cost of packaging as agreed with Customer or in the lack of agreement as the common practice may be for the Product, carriage, delivery, and insurance of the Product up to the point of delivery according to agreed INCOTERMS, unless otherwise agreed by the Parties in writing. All prices quoted and invoiced are inclusive of all payments that shall be payable by the Customer to the Supplier. After acceptance of an order the Supplier shall not include any changes in the price of the Product, delivery dates, quantities or specifications included in the Customer's order.

4. TERMS OF PAYMENT.- Payment for the Product shall be made by way of cheque or direct bank transfer to the Supplier's bank account, details of which shall be provided to the Customer.

All invoices are payable within the period established in the Customer's Order. The Customer shall be entitled to make any deduction from the price or withhold payment in the case of delays or default supply by the Supplier.

5. TITLE/RISK.- Risk of damage to or loss of the Product shall remain with the Supplier until the time of delivery to the Customer.

6. INTELLECTUAL PROPERTY and ARTWORK.- The Supplier shall hold the Customer harmless of all claims and liabilities for infringement of rights in connection with intellectual property rights, including registered rights, know how, artwork, composition or any other included in the Product or used for its manufacturing process until delivery to Customer. As a consequence the Supplier shall hold the Customer harmless for any costs, damaged or expenses that may result thereof.

7. DELIVERY.- The Supplier shall deliver the Product within the time stated. If the Product is not delivered within two days after delivery time, the Customer shall be entitled, without prejudice to any other remedy, (or a) cancel the Contract and any other agreement between the Parties; and/or b) claim delivery under any Contract and any other agreement between the Parties. Unless otherwise agreed in writing, the Supplier shall arrange for the carriage of the Product and deliver it to the Customer's place of business or such other place nominated by the Customer according to agreed INCOTERMS. Each delivery or consignment shall stand as a separate Contract. Where applicable, the quantity and weight of any consignment of the Product as recorded by the Supplier upon despatch from the Supplier's place of business shall not be conclusive unless on notification is made by the Customer to the Supplier in accordance with clause 9. Deviations of quantities of the Product whether in deficit or in excess will constitute non fulfilment of delivery of the Product.

8. CANCELLATIONS AND CHANGES.- Requests for cancellation of an order, deferment of delivery date, or change in the quantity, design or size of the Product can be notified by the Customer to the Seller until the order is in the process of production or preparation. Supplier shall inform Customer a request unless it is proved that production or preparation for such particular order has started. Under the Customer's request Supplier shall make all reasonable efforts to find an alternative Customer for the Product.

9. NOTIFICATION OF DAMAGE, NON-DELIVERY AND DEFECTS.- The Customer shall notify the Supplier in writing within 15 days of the date of delivery of any transport damages or, partial loss or non-delivery of the Product, or in the case of total non-delivery within 15 days of the date by which the Product should have been delivered. The Customer shall notify the Supplier in writing within 30 days of the date of delivery of the Product is defective; or if it is in any way not in accordance with the Contract.

10. RETURNS.- Returns of unused Product in original condition and in unbroken, undamaged packaging with their original labels, shall be admitted by Supplier for credit to the Customer's account within 30 days after shipment.

11. LIABILITY.- The Seller warrants that Product delivered to Customer shall meet the Customer's standard specifications for such Product or any special specifications that are specifically agreed upon between the Seller and the Customer. The Seller declares that he is aware of the Customer's activities and final use of the Product and warrants merchantability and suitability of the Products for any particular use or purpose within the current activities of the Customer whether on its own or in combination with other substances. If the Customer establishes to the Supplier's reasonable satisfaction that the Product is not in accordance with the Contract or is defective, the Customer will have the option either to replacement of the Product or refund of the purchase price upon return of the Product without prejudice of any other remedies. The Supplier shall bear all charges for rejection of the Product. The Supplier's liability shall include all damages of any kind including without limitation, direct, indirect, incidental, punitive, special and consequential damages (including without limitation loss of profits or loss of revenue) arising out of or in connection with the Product supplied, whether by the negligence of the Supplier, a fraudulent misrepresentation made by the Supplier or any other reason.

12. TERMINATION BY THE CUSTOMER.- Without prejudice to any other rights to which it may be entitled, the Customer shall have the right to determine or suspend performance under the Contract with immediate effect if: a) the Supplier is in default or commits a breach of the Contract or these Terms and Conditions of by an order is made or a resolution is passed for the winding up of the Supplier or circumstances arise which entitle a court of competent jurisdiction to make a winding-up order of the Supplier; or c) an order is made for the appointment of an administrator to manage the affairs, business and property of the Supplier or documents are filed with a court of competent jurisdiction for the appointment of an administrator of the Supplier or notice of intention to appoint an administrator is given by the Supplier or its directors or by a qualifying floating charge holder; or d) a receiver is appointed of any of the Supplier's assets or undertaking or if circumstances arise which entitle a court of competent jurisdiction or a creditor to appoint a receiver or manager of the Supplier or if any person takes possession of or sells the Supplier's assets; or the Supplier makes any arrangement or composition with its creditors or makes an application to a court of competent jurisdiction for the protection of its creditors in any way; or e) the Customer ceases to trade; or f) there is a change of control of the Customer. If, in any of the circumstances set out in this clause, Product has not been delivered to the Customer and has not been paid for, the obligation of payment shall disappear immediately notwithstanding any previous arrangement to the contrary.

13. FORCE MAJEURE.- If either party is prevented, hindered or delayed in performing any of its obligations under this Agreement, by reason of a Force Majeure Event, it shall forthwith and in any event within 7 days give written notice to the other party declaring the extent of this Force Majeure Event, the date of its commencement and the effects of the Force Majeure Event on its ability to perform its obligations under the Contract.

Subject to service of such notice and having taken all reasonable steps to avoid such prevention or delay, the obligations of the party affected by the Force Majeure Event shall be suspended for so long as the circumstances may continue and until such time after they cease as is necessary for that party, using all reasonable endeavours, to recommence its affected operations in order for it to perform its obligations.

The party affected by a Force Majeure Event shall use every reasonable effort to minimise the effects thereof and shall remove performance as soon as possible. If either party is prevented from performance of its obligations for a continuous period an excess of sixty (60) days from the date of giving notice of the Force Majeure Event, the other party may terminate this agreement forthwith by written notice, whereupon: 1) all pending deliveries of the Product shall be cancelled unless the Customer notifies the Supplier otherwise; and 2) the Supplier shall immediately repay to the Customer any sums paid in respect of undelivered Product. For the purposes of this Agreement, "Force Majeure Event" means any event beyond the reasonable control of a party including without limitation acts of God, war, riot, civil commotion, acts of terrorism, malicious damage, compliance with any law or governmental order, rule, regulation or direction, accident, fire, flood, storm, strikes, semolina or delays affecting markets and breakdown of plant or machinery.

14. NOTICES.- Unless otherwise agreed, all notices which are required to be given hereunder shall be in writing and shall be delivered by hand or sent by first class post: in the case of notices to the Customer, to its registered office, County Court 30 Montgomery. in the case of notices to the Supplier, to its registered office or such other address as shall be notified to the Customer by the Supplier.

15. GENERAL.- If any of these Terms and Conditions is deemed unlawful, void or for any reason unenforceable, then that term or condition shall be deemed severable from these Terms and Conditions and will not affect the validity and enforceability of any remaining Terms and Conditions. Failure by the Customer to enforce any of these Terms and Conditions will not constitute a waiver of its rights to subsequently enforce such or any other of its Terms and Conditions. Neither party shall assign or otherwise transfer the Contract or any of its rights and obligations hereunder whether in whole or in part without the prior written consent of the other. A person who is not a party to the Contract has no rights to enforce any part of the Contract.

16. LANGUAGE.- The language of these Terms and Conditions of Purchase, as well as any contract for the purchase of the Product that we enter with, you shall be English, which shall prevail over any other languages the Parties may use for their communication.

17. JURISDICTION.- The Contract shall be governed by and construed in accordance with the laws applicable at the legal domicile of the Customer and shall be subject to the jurisdiction of the Courts thereof.

18. VARIATION.- Any typographical, clerical or other error or omission in any order confirmation, payment document, or any other document or information issued by the Customer shall be subject to correction at any time without any liability on the part of the Customer. No officer, servant or agent of the Customer has authority to vary this Contract except with the express written consent of the Customer, and the Supplier acknowledges that it does not rely on any such representations which are not so confirmed.

Brazil - Canada - Czech Republic - China - Costa Rica - Germany - Mexico - Russia - Serbia - Spain -Thailand - United Kingdom - Uruguay - USA

Viscofan S.A. · VAT / N.I.F.: ES.A3106550-1 · Inscrita en el registro Mercantil de Navarra, Tomo 316, Folio 24 - 3,915

Page 2 of   2

## **EXHIBIT B**

## BLANKET AGREEMENT TO HOLD HARMLESS AND TO PROCURE INSURANCE

TO:    Viscofan USA, Inc. (the "Company")
        Attention Purchasing Department
        915 North Michigan Avenue
        Danville, IL 61832

Gentlemen:

In consideration of the execution and delivery by you of a purchase order accepted by us and this Agreement between us dated _Jarvis Welding_, wherein we agree, as an Independent Contractor, to perform certain work for you (the "Company"), we promise, covenant and agree:

    1.    To indemnify, protect and save harmless the Company, its property, its agents and employees from and against all loss and expenses (including costs and reasonable attorneys' fees) that may be claimed or asserted against, or be imposed by law upon, the Company on account of, resulting from, arising out of, or in consequence of the performance of our work, including, without limitation, to indemnify, protect and save harmless the Company from and against all loss, expenses (including reasonable attorneys' fees), claims suits, action, demands, liens, damages, fines, penalties, judgments or decrees, or claims or damages of whatsoever kind or nature:

        A.    For personal injury, including death to any person, including workmen, whether or not employed by us;

        B.    For damage to any property, including loss of use thereof, whether real, personal or mixed;

        C.    For damage to any property, including loss of use thereof, whether real, personal or mixed;

        D.    For claims of our subcontractors and/or employees for services rendered or materials furnished in connection with the work, including all costs incurred in the removal of mechanics' liens resulting directly or indirectly from the performance of the work.

        Our obligation to indemnify, protect and save harmless the Company from and against all claims shall apply and be enforceable, irrespective of whether such claims are claimed to be due to the negligence or fault of the Contractor, his subcontractors or the Company. The indemnification provided herein shall be effective to the maximum extent permitted by applicable law. The Contractor shall be solely responsible for the defense of any and all claims, demands or suits against the Company or its officers, representatives and employees, including, without limitations, claims by any employee of the Contractor or others, even though the claimant may allege or assert willful misconduct or sole negligence on the part of the Company.

1

To assure you of our ability to perform our obligations under the foregoing indemnity and hold harmless agreement, we shall procure and maintain the insurance coverage's set forth in Paragraph 2 which follows, which coverage's and policies of insurance shall name the Company as a named insured or additional insured.

2.     To procure and maintain all forms and coverage's of insurance necessary to protect, indemnify, save and hold harmless the Company, its property and its representatives and the Contractor, insuring against all risks and claims that may derive from the statutes of the State of Illinois or the United States of America, or any regulations promulgated thereunder, including, but not limited to the following:

A.     Without limitation, such insurance shall protect and indemnify against at lease the following:

(1)     Illinois Workers' Compensation Act

(2)     Occupational Safety and Health Act

(3)     Illinois Structural Work Act

(4)     Employer's Liability

(5)     Illinois Contribution Among Joint Tort-feasors Act

(6)     Illinois Wrongful Death Act

(7)     Illinois Survival Actions

B.     Such insurance policies and coverage shall provide the following coverage:

(1)     Commercial or Comprehensive General Liability Coverage in an amount not less than $1,000,000 per occurrence, which shall contain at a minimum the following forms of coverage:

(a)     Business Auto Coverage
(b)     Products/Completed Operation Liability Coverage
(c)     Contractual Liability Coverage
(d)     Operations/Premises Liability Coverage referenced to the Company's plant.

(2)     Illinois Workers' Compensation liability mid Employers' Liability coverage in the statutory amount, but not less than $100,000.

2

> (3)    Owners and Contractors Protective Liability Coverage in an
>         amount no less than $2,000,000 per occurrence.
>
> C.    The Commercial or Comprehensive General Liability Coverage's referred to
>       in subparagraph (1) above shall name the Company as a "named insured" or
>       "an additional insured"; and the Owners and Contractors Protective Liability
>       Coverage referred to above in subparagraph (3) above shall name the
>       Company and the Contractor as insureds.

3.    To perform all work in accordance with the terms and conditions set forth in the
      attached Exhibit A, which Exhibit is incorporated in this Agreement by reference.

4.    To require the execution and delivery to you by any subcontractor of ours a
      promise of indemnification equivalent in effect to our promise set forth in
      Paragraph 1 hereof; and to require of such subcontractors the maintenance of
      insurance as set forth in Paragraph 2 and the delivery for your examination of
      policies of such insurance and also to require any and all subcontractors to
      perform all work in accordance with the terms and conditions of Exhibit A,
      including provisions set forth in Paragraph 2 above.

5.    That the provisions of Paragraphs 1 and 2 above, when read and interpreted together,
      constitute a "construction bond", as that term is referred to in Section 35/3 of
      Chapter 740 of the Illinois Compiled Statutes, and that, therefore, the provisions of
      Section 35/1 of Chapter of Chapter 740 of the Illinois Compiled Statutes have no
      application to the indemnity provisions set forth in Paragraph 2 above.

6.    That we are self-employed consultants and contractors, and that in no event shall you
      be responsible or liable for and we hereby indemnify and save you harmless from:

      A.    Any claim for wages, salaries, or other expenses incurred as the result of
            labor expended.

      B.    Any claim for income taxes, social security taxes, or other taxes incurred as
            a result of wages or salary earned through performing work for you.

7.    That as used herein, the terms "you" or the "Company" refer to Viscofan USA,
      Inc., and the terms "we", "our" or the "Contractor" refer to the firm or entity on
      whose behalf the Agreement is executed as shown on the last page of this Blanket
      Agreement.

This agreement shall be effective as of ___6-14-16___ , and applies to future
orders or agreements until revoked in writing by the undersigned. The terms "work" and
"agreement" as used herein, shall include work done under other agreements by us, whether as

3

prime contractors or as subcontractors, for Viscofan USA, Inc., or for the benefit of Viscofan USA, Inc., provided that such agreements or purchase orders specify that this "BLANKET AGREEMENT APPLIES".

FIRM: _Jarvis Welding_

AUTHORIZED SIGNATURE:

TITLE: _Partner_

DATE: _6-14-16_

4